# EXHIBIT A

1

Volume I
Pages 1 to 167
Exhibits 1 to 21

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - -x
                                    :
RUTH ANTHONY,                       :
            Plaintiff,              :
        vs.                         :
                                    :   C.A. No.
RALPH BUSBY, JOHN BUTLER,           :   03-cv-12423-RWZ
MARV TODD, JACQUELINE               :
NEWSTADT, PATTI SKILES and          :
COMPUTER SCIENCES CORPORATION       :
(CSC),                              :
            Defendants.             :
                                    :
- - - - - - - - - - - - - - - - - -x

        DEPOSITION OF RUTH ANTHONY, a witness
called on behalf of the Defendants, taken pursuant
to the Federal Rules of Civil Procedure, before
Ken A. DiFraia, Registered Professional Reporter and
Notary Public in and for the Commonwealth of
Massachusetts, at the Offices of Doris O. Wong
Associates, Inc., 50 Franklin Street, Boston,
Massachusetts, on Tuesday, November 23, 2004,
commencing at 10:00 a.m.

PRESENT:

    Ruth Anthony
        60 Edgewood Street,
        Roxbury, MA 02119, pro se.

    Jackson Lewis LLP
        (by Joan Ackerstein, Esq., and
        Heather Stepler, Esq.)
        75 Park Plaza, Boston, MA 02116,
        for the Defendants.

ALSO PRESENT:  Tyler Raimo, Esq., in-house Counsel
               for Computer Sciences Corporation (by
               telephone); and Patti Skiles

59

1    A.    About seven years, five or six years old

2    maybe.

3              MS. ACKERSTEIN:    It's quarter after eleven.

4    Let's take a short break.

5              (Recess at 11:15 a.m.)

6    BY MS. ACKERSTEIN:    (11:29 a.m.)

7    Q.    You told us before that you became employed

8    by Unisys Corporation in January of 1997, do you

9    remember that?

10    A.    Yes.

11    Q.    At that time, Unisys had a contract with

12    the Federal Aviation Administration, Enhanced

13    Traffic Management System?

14    A.    Yes.

15    Q.    In about November of 1997, you became

16    employed by CSC?

17    A.    Yes.

18    Q.    I gather that CSC at that time assumed the

19    contract that Unisys had had?

20    A.    Yes.

21    Q.    Your work that you had been doing at Unisys

22    transferred over, and you were now doing that work

23    for CSC?

24    A.    Yes.

60

1      Q.    What was the work that you were doing?  Can

2  you describe that to us.

3      A.    Technical writing, writing using manuals,

4  training manuals, documenting the traffic management

5  system, different, you know, standards and

6  procedures for the documentation group and for ETMS,

7  the traffic management system.  I was writing system

8  manuals, all kinds of technical user documentation

9  for the air traffic controllers.

10                  (Document marked as Anthony

11                  Exhibit 2 for identification)

12     Q.    Exhibit 2 is a photocopy of a letter that

13  went to you.  It's dated October 17, 1997.  It says,

14  "Thank you of your acceptance of CSC's offer of a

15  position on the information system services contract

16  at the Volpe National Transportation System Center."

17              Do you recall receiving this letter,

18  Ms. Anthony?

19     A.    Yes.

20     Q.    In October of '97, CSC made a job offer to

21  you to make you a member of the technical staff?

22     A.    Yes.

23     Q.    Your starting salary was $42,016?

24     A.    Yes.

61

1      Q.    According to this, there was a new hire

2   orientation scheduled for the week of October 27, do

3   you see that?

4      A.    Yes.

5      Q.    You were scheduled for an orientation on

6   October 29th?

7      A.    Yes.

8      Q.    Did you attend that?

9      A.    Yes.

10      Q.    Before CSC made you this offer, did you

11   interview with someone?

12      A.    Yes.

13      Q.    Who did you interview with?

14      A.    Someone at CSC.   I don't remember who it

15   was, though.

16      Q.    Where did the interview take place?

17      A.    In the Volpe Center.

18      Q.    The Volpe Transportation Center?

19      A.    Yes.

20      Q.    The Volpe Center is in Cambridge,

21   Massachusetts?

22      A.    Yes.

23      Q.    That's owned by the federal government?

24      A.    Yes, Department of Transportation.

62

1        Q.    It's owned by the Department of

2   Transportation, and is it fair to say that from the

3   Volpe Transportation Center, there's a monitoring

4   system of all the airlines flying daily in the

5   United States?

6        A.    Yes.

7        Q.    That's what the Volpe Transportation Center

8   does, doesn't it?

9        A.    It's one of the programs that I'm aware of,

10  yes.

11       Q.    You went over to interview at the Volpe

12  Center building in Cambridge, and you were

13  interviewed by someone at CSC?

14       A.    Yes.   That's where I was working, at the

15  Volpe Center, for Unisys.  I just went to a floor

16  somewhere in the Volpe Center and interviewed with

17  someone from CSC.

18       Q.    CSC was winning the contract that Unisys

19  had had, and so then CSC was interviewing Unisys

20  employees to see who they wanted to hire?

21       A.    I believe so.  I don't know how it works.

22  All I know is the supervisor told me that, he told

23  the staff that we should -- that CSC had won the

24  contract and that we should go and interview, submit

63

1   resumes, schedule interviews with CSC at some point,

2   at some date.  They were holding interviews before

3   that.

4       Q.    You interviewed, and you received a job

5   offer?

6       A.    Yes.

7       Q.    When you worked at Unisys, were there other

8   technical writers in the department working with

9   you?

10      A.    Yes.

11      Q.    Who were you reporting to?

12      A.    Michael Potash.

13      Q.    He was employed by Unisys?

14      A.    Yes.

15      Q.    Who were the other technical writers that

16  you were working with at Unisys, do you remember?

17      A.    Mary Costello, and there was Michael

18  Sullivan and James Green.  I think that was all, as

19  I remember, at the time.

20      Q.    Did Michael Potash become a CSC employee?

21      A.    Yes.

22      Q.    Did any of these other people become CSC

23  employees?

24      A.    Michael Sullivan.

64

1      Q.    How about James Green?

2      A.    James Green was with -- he wasn't a Unisys

3   employee.  He was with EG&G, I think.

4      Q.    Mary Costello was with Battell?

5      A.    Yes.  She went with Battell.

6      Q.    James Green didn't become a CSC employee,

7   and Mary Costello did not become a CSC employee; is

8   that right?

9      A.    Right.

10     Q.    When you became a CSC employee in November

11  1997, who did you begin reporting to?  Was it still

12  Michael Potash?

13     A.    Yes.

14     Q.    The other technical writers were Mary

15  Costello, Michael Sullivan and James Green?

16     A.    Yes.

17     Q.    How long did you continue to report to

18  Mr. Potash?

19     A.    I guess a couple of years.

20     Q.    Did Mr. Potash get laid off at some point?

21     A.    I don't know what happened to him.  He

22  disappeared.

23           I didn't even know that he had left.  I

24  didn't know that I no longer reported to him.  I

66

1      A.    No.

2      Q.    How about Mr. James Green, was he a

3  technical writer in 2002 when you left?

4      A.    When I left, yes.

5      Q.    When you left in February of 2002, the

6  technical writers were Mr. Green, yourself, Mary

7  Costello?

8      A.    Yes.

9      Q.    Mr. Green was still employed by EG&G?

10     A.    No, Battell.

11     Q.    At some point, he transferred from EG&G to

12  Battell?

13     A.    Yes, because EG&G I guess was tied to

14  Unisys, so he had to interview for a job as well.

15  He went with -- when CSC came on with their team,

16  Mr. Green went and interviewed and was hired by

17  Battell, and Ms. Costello.

18     Q.    Went to Battell?

19     A.    Yes.

20     Q.    In 2002, when you left, the technical

21  writers were Mr. Green and Ms. Costello, who were

22  employed by Battell, and you, who was employed by

23  CSC?

24     A.    Yes.

1    A.    Yes.

2    Q.    So you did get along with her?

3    A.    Yes, I thought we did.  I mean, we had

4 debates and different views and whatnot, but we also

5 had a lot of fun working together.

6    Q.    Is it fair to say that you generally got

7 along well with everybody at CSC?

8    A.    I thought I did.

9    Q.    Your problem with CSC is the termination of

10 your employment?

11    A.    Yes.

12    Q.    Is that what this lawsuit is about?

13    A.    Yes, because it stemmed from -- first it

14 was just unfair treatment, because I had asked for

15 training.  You know, I got to a point where I felt

16 like I know they know I was doing a good job, and at

17 first I didn't feel like I was being rewarded enough

18 or well enough for it.  I asked for training.  I was

19 denied training.

20        Then after Ms. Costello told me that she

21 got a promotion, I asked for a promotion, and I was

22 denied a promotion.  That's when I filed the

23 complaint with the MCAD, Mass. Commission Against

24 Discrimination, because when I asked John Butler,

72

1   who was still the manager, for a promotion or I

2   asked him, you know -- oh, I asked how could I get

3   promoted and what did I have to do, and he said,

4   "You make enough money."

5           Then I felt like, you know, I needed an

6   objective opinion, so I went to the MCAD.  After I

7   went to the MCAD, and I told them about Ms. Costello

8   getting promoted to manager and that they had these

9   positions that they didn't even tell me and allow me

10  to apply for and everything.

11          Then after I complained with MCAD and I

12  compared myself to Ms. Costello because we were the

13  only two in the department at that time, then that's

14  when the problems, the work problems with

15  Ms. Costello and I started.

16          I guess it was because she must have been

17  aware that I, you know, complained, and I guess she

18  took it, you know, personally.

19          We started to have, you know, work issues.

20  It just went downhill from there.

21      Q.   Let me see if I understand this.  You

22  brought a claim at the Mass. Commission Against

23  Discrimination because you felt that Ms. Costello

24  got a promotion and got training that you didn't

73

1  get?

2      A.   Yes, and probably other people, too.  I

3  didn't even know.

4          They did things and didn't even tell me.  I

5  didn't even know.  I didn't even know people could

6  be promoted because I never heard of anybody being

7  promoted, but that was not to say that they were not

8  promoted.

9      Q.   Is there anybody that you are saying you

10 are aware of who got training or a promotion that

11 you think you should have gotten other than

12 Ms. Costello?

13     A.   No.

14     Q.   You didn't ever supervise Ms. Costello, did

15 you?

16     A.   No.

17     Q.   You never have seen her performance

18 reviews, have you?

19     A.   No.

20     Q.   Do you know who she reported to at Battell?

21     A.   Yes.

22     Q.   Who did she report to?

23     A.   Steve Hannigan, or something.

24     Q.   What was his title?

74

1    A.    I don't know.

2    Q.    But he worked for Battell?

3    A.    Yes.  But she reported to Marv Todd.  We

4    just continued doing the same work.  Everything

5    continued the same as from when we worked for

6    Unisys.

7    Q.    You don't know, though, who made the

8    decision to promote her, do you?

9    A.    No.

10   Q.    You don't know who made the decision to

11   provide her additional training?

12   A.    I don't know who made the decision, but I

13   know she had it.  She got it.  It was up to, I would

14   think, Mr. Todd and Mr. Butler.

15   Q.    That's what you believe?

16   A.    Yes, to approve it.

17   Q.    You think Mr. Todd and Mr. Butler must have

18   approved this; that's what you think?

19   A.    Yes, because how could she be documentation

20   manager over ETMS when they were in charge of ETMS?

21   Q.    Are you basing this on anything other than

22   it makes sense to you?

23   A.    It makes sense to me.  Or that's a

24   question.

1          This is what I'm saying about when I ask

2     questions.  When I ask questions, everybody like

3     backs off, and I never can get a clear answer.  I

4     think I have the right to know.

5          Q.   Well, you heard an answer.  I mean, it's

6     accurate, is it not, that you were told that

7     Ms. Costello didn't work for CSC and that somebody

8     other than CSC was making decisions about her;

9     you've been told that, haven't you?

10         A.   Well, I have seen it in their response,

11    yes.

12         Q.   Ms. Costello worked at Unisys before you

13    did, didn't she?

14         A.   Yes.

15         Q.   Wasn't she there about ten years before you

16    were there?

17         A.   I have no idea.

18         Q.   You don't know how long she worked at

19    Unisys?

20         A.   No.

21         Q.   You don't know anything about her

22    educational background?

23         A.   Yes.  I know some.

24         Q.   What do you know?

78

1    position because I even asked Mr. Todd about one of

2    the positions that they were interviewing for, and

3    he said that they would be -- that I would be

4    helping them.  I said, "Because this seems to be

5    most of the work."  I said, "Well, I could do this.

6    I'm already doing it."

7         He said, "Well, you would continue helping

8    this person."

9         Q.   Did they ever hire any person?

10        A.   I don't know.  They hired someone.  Then he

11   died of a heart attack.  Then I don't know.  Because

12   they never told me.

13        Then there was another person who was in

14   the group they told me that -- he told me -- I

15   didn't even know who was in the group.  They never,

16   you know...

17        That's why I list those four people at the

18   time.  There may have been even more and I didn't

19   know about it.

20             (Document marked as Anthony

21             Exhibit 3 for identification)

22        Q.   Exhibit 3 is a photocopy of a charge,

23   Ms. Anthony, dated April 2, 2001.  I take it this is

24   a charge of discrimination you filed against CSC?

79

1      A.    (Examines document)  Well, wait a minute.

2   I don't remember this first part.

3      Q.    How about the next page?

4      A.    Okay, wait a minute.  This page with my

5   signature on it and these pages in the back, yes.

6          I don't know about the front.  I don't

7   remember getting this (indicating).  This is from

8   CSC?

9      Q.    How about beginning with the third page,

10  the one that has your signature at the bottom?

11     A.    It's the fourth page.  Yes.

12     Q.    Is this a charge that you filed,

13  Ms. Anthony?

14     A.    Yes, initially.

15     Q.    How about the attachment?

16     A.    Yes.

17     Q.    Did you prepare that?

18     A.    Yes.

19     Q.    Look at the first page where it has your

20  signature, do you see that?

21     A.    (Examines document)  Yes.

22     Q.    It says that you were the only black

23  technical writer out of four.  Who were the four in

24  April of 2001?

1      A.    Okay, I guess the four that I named before,

2   Michael Potash, I guess he was still there, so

3   Michael Potash, James Green, Mary Costello, and

4   myself.

5      Q.    You say you are the lowest paid employee

6   for the same or similar work.  Do you know what any

7   of these three people were making?

8      A.    No.

9      Q.    You say that you were overlooked for

10  promotions.  Is that the documentation manager

11  position that Ms. Costello told you that she had?

12  Is that what you are talking about there?

13     A.    Well, no.  Even before that, because I

14  don't know -- yes, I guess she had been promoted

15  then.  I don't remember.  This is so long ago.  I

16  mean, it was even before that.

17          Like I said, there were other positions

18  before when she told me that she had, you know,

19  become the doc manager.

20     Q.    What positions?

21     A.    They were looking for technical -- I don't

22  know what they call them -- application developer or

23  something like that, and it required like

24  documentation.  Because, really, some of the job

1   description I saw, you know, it required some

2   knowledge of code, which I could have, you know,

3   been trained for or done.

4       Q.   As we sit here today, Ms. Anthony, you

5   can't give us a particular job title or a date that

6   you are talking about?

7       A.   Well, the position that -- I don't

8   remember.  I really don't remember.  I know there

9   were positions, though.

10          Because they were interviewing people.  I

11  asked Mr. Todd, "Well, why are you interviewing?"  I

12  asked was it a manager position.  Was it a

13  management position.  Was it like Michael Potash's

14  job.  He said, "No."

15      Q.   I'm just trying to find out, Ms. Anthony,

16  today can you tell us any particular position or

17  date of anything other than the documentation

18  manager that Ms. Costello told you she was?

19      A.   Well, right now I'm focusing on the

20  documentation manager that she told me because I

21  don't remember.  I know there were others, though,

22  before that.

23          I guess it was like since after the doc

24  manager left, but I didn't know how -- I was sort of

87

1    will change the forms, and we will say it was an

2    involuntary termination," would that be the end of

3    this?

4        A.    No, because it was not an involuntary

5    termination.  They should have asked me to resign or

6    something.  You know, I mean...

7            It was not a -- if they just changed the

8    form and say that they fired me or laid me off or

9    something, then that's what happened.

10           Like I said, when I went there that day, I

11   had no idea that that was going to be my last day.

12       Q.    Let me ask you some questions about that,

13   okay?

14       A.    Okay.

15       Q.    At some point at least by June of 2001, you

16   knew there was some discussion of a move to

17   5 Cambridge Center?

18       A.    I had heard.  I heard from Mary Costello,

19   like I heard everything mostly.

20       Q.    How far was 5 Cambridge Center from the

21   Volpe Center?

22       A.    A couple of blocks.

23       Q.    Had you ever been to 5 Cambridge Center?

24       A.    Yes.

1    Q.    Why would you have gone to 5 Cambridge

2    Center?

3    A.    Because HR was there.  Ms. Skiles' office

4    was there, and I even came over there to view the

5    location of where we were supposed to move.

6    Q.    When did you do that?

7    A.    I don't remember, but it was one day

8    between that time.

9    Q.    When you say Patti Skiles of human

10   resources was at 5 Cambridge Center, it's fair to

11   say that in 2001 and 2002, some employees of CSC

12   worked at the Volpe Center and some worked at

13   5 Cambridge Center?

14   A.    Yes.

15   Q.    There was a plan to move people, some

16   people from the Volpe Center to 5 Cambridge Center;

17   is that right?

18   A.    I don't know.  All I know is I was asked to

19   move.

20              (Document marked as Anthony

21              Exhibit 4 for identification)

22   Q.    Exhibit 4 is a photocopy of a document that

23   you provided to us.  It has 3 E-mails on here.  The

24   first one is June 22nd at 12:22 p.m.  The second one

89

1   is from Richard Fisher to a number of employees

2   dated June 26th.   The third one is from John Butler

3   to Mary Costello, you, James Green, and Maria

4   Bonavita.   Who is Maria Bonavita?

5       A.    The administrative assistant, I believe.

6       Q.    This says, "There is a draft plan that I do

7   not have a copy of but will get that presently

8   includes Ruth, Mary, Jim, Maria and myself at the

9   new facilities at 5 Cambridge Center."   It says, "We

10  are presently on the list for a move."   You got this

11  E-mail back in June of 2001?

12      A.    Yes.

13      Q.    Had you actually heard prior to this that

14  there was a chance that some people might be moving

15  to 5 Cambridge Center?

16      A.    Yes, because when I heard, I asked him, and

17  that's when he sent this I think.

18      Q.    Is it in June of 2001 that you actually

19  went over to 5 Cambridge Center?

20      A.    No, I don't think so.   I don't remember.   I

21  don't remember.

22                  (Document marked as Anthony

23                   Exhibit 5 for identification)

24      Q.    Exhibit No. 5 is a photocopy of another

90

1   E-mail that you provided to us.  It's dated

2   October 22nd, do you see that?

3       A.   (Examines document)  Yes.

4       Q.   It's from John Butler to Ruth Anthony,

5   James Green, Mary Costello and Rosanna Masciarelli.

6   Who is Rosanna Masciarelli?

7       A.   I thought she was an administrative

8   assistant.  Then I heard she was a technical writer,

9   so I don't know.  I mean, I know who she is, but I

10  don't know what her job position was.

11      Q.   This E-mail actually starts at the bottom.

12  You sent an E-mail on October 22nd at 11:08 to John

13  Butler and Marvin Todd.  What was Mr. Butler's

14  position?

15      A.   I guess senior manager.

16      Q.   Do you know Mr. Todd's title?

17      A.   I just called him project manager.  I don't

18  know anybody's real title.

19      Q.   You reported to Mr. Todd, and Mr. Todd

20  reported to Mr. Butler?

21      A.   Yes.

22      Q.   You sent this E-mail to your boss' boss on

23  October 22:  "I just received an E-mail message

24  regarding office furniture for 5 Cambridge Center.

91

It states that I will be moving to that location
sometime in the future.  Please let me know when
this move is expected to take place.  I would also
like to know the plan for conducting my work.  What
types of assignments are planned for me, will the
group organization change, if so how?"

          You sent that E-mail?

     A.    Yes.

     Q.    The original E-mail message you received
involving office furniture asked you to identify
furniture that would be going with you?

     A.    Something about pick furniture out.  It
said, "By now you should know you are moving and you
should pick furniture out.  Let us know what you
need," or something like that.

     Q.    They were asking what furniture you would
need in your new office?

     A.    Yes, I guess.  I didn't know anything about
it, though.  This was really for others, the people
who were in the other building who were moving to
5 Cambridge Center anyway from First Street.

     Q.    Then in response, you got this E-mail
message back from John Butler, right?

     A.    Yes.

96

1        A.    I brought them home with me.  Yes.

2        Q.    On January 9th, you get an E-mail from

3   John E. Johnson.  Who is John E. Johnson?

4        A.    I have no idea.

5        Q.    He says, "Hi, Ruth.  Your office and phone

6   over here are ready for you."  He gives you the

7   phone number and your Audix password.  The subject

8   is "New Office at 5 Cambridge."

9             You knew on January 9th that there was an

10  office ready for you at 5 Cambridge Center?

11       A.    Yes.  I saw the office.  I went over and

12  everything.  He said the network wasn't ready yet,

13  so that still didn't mean the move yet.

14       Q.    You actually went over, though, and looked

15  at your office?

16       A.    Sometime between, you know, June and now,

17  this here, but I don't remember when exactly.

18       Q.    It was a nice office, wasn't it?

19       A.    Yes.

20       Q.    It was bigger than what you had at the

21  Volpe Center?

22       A.    Yes.

23       Q.    It had a nice view?

24       A.    Yes.

99

1    about the move.  It might have been this E-mail or

2    something, one of them.  I don't remember.

3                    (Document marked as Anthony

4                    Exhibit 7 for identification)

5         Q.    Exhibit 7 is a photocopy of an E-mail that

6    you sent to John Butler and Marvin Todd on

7    January 17th.  It says, "As a follow up on our

8    discussion last Friday afternoon regarding my future

9    work assignments, reporting structure and

10   responsibilities."

11              Does that refresh your recollection about a

12   conversation you had with them on a Friday

13   afternoon?

14        A.    Yes, because we didn't finish.  He got a

15   phone call and turned his back to me and started

16   talking on the phone.

17        Q.    Who is the "he" you are referring to?

18        A.    John Butler.

19        Q.    You told him in that conversation you

20   didn't want to move to 5 Cambridge Center?

21        A.    I asked him, you know, about -- you know, I

22   sent the E-mail, and I said, "If they are not

23   going" -- and by now we had already established this

24   thing, Well, they are Battell, so they are

1    different.  They don't have to go by the same rules

2    as CSC and stuff.  In essence, I'm the only one from

3    CSC going, so when I go over there, who will I

4    report to, what will I do.  I mean, I'm going to be

5    the only one over there.

6        Q.    You knew Mary Costello was going to have an

7    office at 5 Cambridge Center, didn't you?

8        A.    She said she was going to have one there

9    and one in the Volpe Center.

10        Q.    Mary Costello was going to have an office

11    at 5 Cambridge Center, and Jim Green was retiring.

12    Why did you think you were the only one going?

13        A.    Because I was.  She probably still is in

14    the Volpe Center.  They probably all still are.

15        Q.    You don't know where anybody is today, do

16    you?

17        A.    No.  That's why I asked for the plan, but

18    nobody gave it to me.  That plan that you sent me, I

19    mean, in the interrogatories was not what I had

20    asked for.

21        Q.    You say that the move, you believe that the

22    move put you at a disadvantage in performing your

23    technical writing job?

24        A.    Yes.

102

1      A.    This is the --

2      Q.    I have to ask the questions.  Before you

3   were told to move to 5 Cambridge Center, you had

4   seen other people from the ETMS team move from the

5   Volpe Center to 5 Cambridge Center, and then their

6   employment ended at some point; that's what you had

7   observed in the past?

8      A.    Yes, soon after.

9      Q.    Was that a concern that you had?  Was that

10  a reason you didn't want to go to 5 Cambridge

11  Center, because you thought your employment was

12  going to end?

13     A.    That was part of it, too.

14     Q.    As you sit here today, you can't tell me

15  who moved from the Volpe Center to the Cambridge

16  Center before you?  You just remember that some

17  people went?

18     A.    Yes, and as soon as they went over there,

19  they left like within a week or two, or within a

20  month.

21     Q.    I assume those people were white?

22     A.    Yes.

23     Q.    You go on in the E-mail to say, "In all my

24  20 plus years as a technical writer for hire and

105

1    I was thinking, "Doc clerk?  Where did that come

2    from?"

3        Q.    Who told you that they were changing your

4    job?

5        A.    Jacqueline Newstadt.

6        Q.    When did she tell you that?

7        A.    After the MCAD hearing.

8        Q.    In April 2001?

9        A.    Yes.

10       Q.    How did your job change after April 2001?

11       A.    It didn't.

12       Q.    Okay.  Thank you.

13       A.    But I think that was probably part of it,

14   though.

15       Q.    After this E-mail on January 17, you wrote,

16   "I prefer to remain located with the ETMS

17   development team," didn't you?

18       A.    Yes.

19       Q.    Then on January 29th, you called Jacqueline

20   Newstadt?

21       A.    I didn't call her.  She called me.

22       Q.    You knew Jacqueline Newstadt?

23       A.    I didn't know her.  I just met her at the

24   MCAD hearing.

106

1    Q.    You met her in April of 2001?

2    A.    Yes.

3    Q.    You met her here in Massachusetts?

4    A.    Yes.

5    Q.    You knew that she worked in human resources

6    for CSC?

7    A.    Yes.

8    Q.    She called you on the telephone?

9    A.    Yes.

10    Q.    She had a conversation with you about the

11    move from the Volpe Center to 5 Cambridge Center,

12    didn't she?

13    A.    Yes.

14    Q.    Do you know why she called you?

15    A.    She just called talking about, you know,

16    "You have to move or you find something else" or

17    something.  I don't know.

18    Q.    You don't know what prompted Jacqueline

19    Newstadt to call, do you?

20    A.    No.

21    Q.    If you learned that Jacqueline Newstadt

22    called because she got a call from the people at CSC

23    in Cambridge who said, "We're having a problem with

24    Ruth Anthony.  We really want her to move to the new

107

1   space, and she doesn't want to move.  Can you talk

2   to her," you don't know whether that happened or

3   not?

4        A.    No, I don't.

5        Q.    What do you recall about the conversation

6   with Ms. Newstadt?

7        A.    Just, you know, that I didn't really want

8   to talk to her because we didn't have -- we had --

9   when I met her, she was very, you know...  She just

10  was like -- we didn't get along.  She was like all

11  over me.

12            I was sorry that I talked with them after

13  the hearing without representation and stuff because

14  she just came on me like so suddenly and, you know,

15  making all these assertions that I, you know, have a

16  problem with Ms. Costello and all this stuff.

17            I really didn't want to talk to her again

18  because I figured, well, she really doesn't know

19  what's going on here.  Nobody told me that she was

20  in charge of anything either.

21        Q.    Didn't she say to you that you would have

22  your own office at 5 Cambridge Center that was nicer

23  and that you would be closer to the train station,

24  do you remember that?

108

1       A.    No.

2       Q.    Do you remember telling her that you didn't

3  want to move?

4       A.    Yes.

5       Q.    Do you remember telling her that you didn't

6  think you would be able to do your job from that

7  location?

8       A.    Yes.    That's when she started asking what

9  was my job.

10      Q.    Do you remember telling her that you felt

11  you would have to go back and forth between the

12  buildings?

13      A.    Yes.

14      Q.    And that you were afraid you wouldn't be

15  able to attend regular meetings with the rest of the

16  project and that you wouldn't know what's going on,

17  do you remember that?

18      A.    Yes, probably.

19      Q.    Do you remember telling her that talking to

20  the developers on the phone was not the same as

21  being able to meet with them in person?

22      A.    I don't remember telling her that, but she

23  was telling me that that's what I could do, that

24  that's what I would be doing, that's how I would do

109

1  it, do the job.

2      Q.    Do you remember telling her that you didn't

3  want to be terminated, but that you would not move?

4      A.    No, I don't remember telling her that.

5      Q.    Do you remember asking for a letter about

6  the impact on your job?

7      A.    No.

8      Q.    Do you remember at any time while you were

9  employed at CSC asking for a separation package?

10     A.    No.  I saw that.  No, no, I did not.  I

11  said that I'm not -- I did say that I felt that I

12  was being pushed out and that they wanted me to

13  leave and that I was not going to leave.  If it was

14  translated like that...

15          Because, you know, I saw that later in the

16  information that you sent to me, and I did not have

17  that.  That's why, because it was not true.

18          We did have, you know, Mr. Todd and I did

19  have -- when he talked to me about, you know,

20  yelling at Ms. Costello, you know, I told him that I

21  was not going to leave, you know.  I said, you know,

22  "Why are you all treating me like this?  Why are you

23  doing this?"  I said, "You must want me to leave.

24  I'm not leaving, you know."

110

1          If it was translated that way, then, you

2     know...

3                    (Document marked as Anthony

4                    Exhibit 8 for identification)

5          Q.    Exhibit 8 is a photocopy of an E-mail that

6     you sent to Ms. Newstadt; is that correct?

7          A.    (Examines document)   Yes.

8          Q.    It's dated January 29.  It says, "Dear

9     Jacqueline, thank you for your employee assistance

10    call today.  I regret that you feel my concerns

11    regarding the move to 5 Cambridge Center lacks

12    substance."

13          I take it that after this call from

14    Ms. Newstadt about your move, you followed it up

15    with an E-mail?

16          A.    Oh, yes.

17          Q.    You did it that evening from your office

18    before you went home?

19          A.    I did it as soon as I got off the phone

20    with her.

21          Q.    It says, "As I told you, from Cambridge

22    Center I am unable to perform my job efficiently as

23    a technical writer with no access to the software or

24    project team.  I am the only CSC employee directed

111

1    to move from the Volpe Center, although I am

2    required to continue documenting the enhanced

3    traffic management system project, which is managed,

4    developed, maintained and tested in Volpe."

5              Those are the words you wrote?

6        A.    Yes.

7        Q.    I gather you felt very strongly about that?

8        A.    It was just summarizing what we had talked

9    about.

10       Q.    Did you feel strongly about it?

11       A.    Well, yes.

12       Q.    You went on to say, "You said CSC has no

13   grievance procedure, and if I do not move, you will

14   consider that job abandonment and I will have to

15   find another job elsewhere."

16             She had told you that if you didn't move,

17   they were going to consider it job abandonment; is

18   that correct?

19       A.    Yes, but who said she was in -- you know, I

20   didn't know she had, you know -- I was like, "That's

21   ridiculous.  I'm not abandoning the job.  I'm not

22   leaving.  I do maintain that by moving me over

23   there, you are hindering my job."  This is what I

24   said.

112

1      Q.   "I explained that I am not abandoning the

2  job but believe CSC is hindering me from doing my

3  job."

4      A.   That's right.

5      Q.   It's fair to say that at no time did you

6  move to 5 Cambridge Center, did you?

7      A.   No, because I didn't know she had the last

8  say.  Nobody said -- she was like, you know --

9  actually, I think at that time, John Butler was on

10  vacation.

11      Q.   Did you have any conversations with anybody

12  about the move to 5 Cambridge Center after your

13  telephone conversation with Jacqueline Newstadt on

14  January 29th?

15      A.   No, not that I remember.

16      Q.   You know Patti Skiles, who is sitting here

17  today, don't you?

18      A.   Yes.

19      Q.   Patti was in the human resources at CSC?

20      A.   Yes.

21      Q.   You had conversations with Patti from time

22  to time while you were employed by CSC?

23      A.   Yes.

24      Q.   Do you recall that Patti Skiles and John

113

1    Butler came to see you in your office at the Volpe

2    Center on February 7th?

3        A.    Yes.

4        Q.    They spent about 45 minutes with you,

5    didn't they?

6        A.    I don't know how long it was.

7        Q.    Didn't they have conversations with you in

8    your office about moving to 5 Cambridge Center?

9        A.    No, not really.  They came in with the

10   papers, and John Butler said -- well, they said,

11   "Hi."  John Butler said, "Ruth, when we last spoke,

12   you were opposed to the move" or something.  "You

13   didn't want to move."  He said, "Do you still feel

14   that way" or "Do you have the same position" or

15   something like that.

16           I said, "Yes."  Then Ms. Skiles started,

17   and she said -- they said, "Well, we have to

18   terminate you.  We have no choice but to terminate

19   you.  Where's your badge?  Do you have your badge?

20   Do you have your key?"  Then they gave me the letter

21   and the packet and everything.

22           They were saying, you know, they were

23   saying all this while they were filling out the

24   papers and collecting the stuff, you know, "It's too

1    bad you didn't move" or something like that.

2        Q.    So you don't remember exactly what they

3    said to you that day?

4        A.    I know they said it like that.  That's how

5    they came in and said it.

6            They didn't come in and say, "We want" --

7    because that's what I thought we were going to talk

8    about, the moving, not with Jacqueline Newstadt.  I

9    thought I was going to talk to somebody here, mainly

10   John Butler or whoever when he said, "Okay, now you

11   can move."

12           I mean, there was no date.  They said they

13   were scheduled to move by this week, but the week

14   was not over.  It was the middle of the day.  They

15   terminated me.

16           They never came there and said, "Well, you

17   know you are supposed to be there in the next five

18   minutes" or whatever or by the end of the day, you

19   know, or by tomorrow, I mean, or anything.

20       Q.    Ms. Anthony, Mr. Butler came to you, and he

21   said to you, "Do you still have the same position?

22   You are not moving to 5 Cambridge Center"; is that

23   what happened?

24       A.    He said, you know, he just said, "You

117

1                    (Document marked as Anthony
2                    Exhibit 9 for identification)
3         Q.    Exhibit 9 is a photocopy of a letter from
4    John Butler to you.  It's dated February 7, 2002.
5    Did you read the letter that day?
6         A.    (Examines document)  Yes.
7         Q.    Did you read it while Ms. Skiles and
8    Mr. Butler were in your office with you?
9         A.    Yes.  I was reading it.  I mean, I told
10   them, I said, "I don't agree with this."
11        Q.    This is the letter that they gave you that
12   day?
13        A.    Yes.
14                    (Document marked as Anthony
15                    Exhibit 10 for identification)
16        Q.    Exhibit 10 is a photocopy of a form, which
17   at the top it says, "TSS, Contract Exit Clearance
18   Form."  Is that your signature at the bottom, a copy
19   of your signature?
20        A.    Yes.
21        Q.    It's dated February 7, 2002?
22        A.    Yes, but that signature is saying that I
23   returned all this stuff, and then they had checked
24   this resignation off after they went and made the

1   Later I found out why they did it like that.

2        Q.   You think that the letter of February 7th

3   and ending your employment is because you filed a

4   charge?

5        A.   Yes.

6        Q.   What makes you think that?

7        A.   Because there was a series of events from

8   the time I filed the charge that went right up until

9   from including the move to this.

10       Q.   Is there something other than the move?

11       A.   The whole thing with Mr. Todd, with

12  Ms. Costello yelling at me and stuff.  I'm sure that

13  resulted because she knew I had just filed a claim

14  and they had her name on it and everything.  Because

15  even though we would debate sometimes, she never

16  reported me to the supervisor and stuff, but then

17  she went and told him she couldn't work with me and

18  stuff.

19            He called me into the office.  We had a

20  talk.  That's when I thought he was terminating me

21  then.

22       Q.   This was April 2001?

23       A.   Yes, April or May.

24       Q.   Is there anything since that time, from

120

1    April or May of 2001 to February 7 of 2002?

2        A.    Well, there was the training and stuff.

3    Even with my review, I had some issues around my

4    review because I still felt, you know, that it was,

5    you know, downplayed because I had done things --

6    which was to help Ms. Costello -- I had done things,

7    tasks that they didn't have on my review.

8            MS. ACKERSTEIN:    It's one o'clock.    Let's

9    take a lunch break.    I will ask you about that this

10   afternoon.

11           (Recessed for lunch at 1:00 p.m.)

12           (Heather Stepler, Esq., exits)

13

14

15

16

17

18

19

20

21

22

23

24

140

1              (Document marked as Anthony

2              Exhibit 14 for identification)

3      Q.    Exhibit 14 is a photocopy of a performance

4  review for you.  It is from the period 11/1/97 to

5  March 31, 1998.  This is Michael Potash doing your

6  review; is that right?

7      A.    (Examines document)  Yes.

8      Q.    I take it you had no issue with this

9  performance review?

10     A.    No, and it was my first one.

11             (Document marked as Anthony

12             Exhibit 15 for identification)

13     Q.    Exhibit 15 is a photocopy of a performance

14  review for the period from April 1, 1998 to

15  March 31, 1999.  You are now a CSC employee?

16     A.    I was a CSC employee with the last one.

17     Q.    This one is done by Marvin Todd?

18     A.    Yes.

19     Q.    He gives you a good review.  A summary is

20  "Good performance, consistently meets expectations

21  and job requirements"?

22     A.    Yes.

23     Q.    "May exceed expectations from time to

24  time"?

141

1    A.    Yes.

2    Q.    He wrote about you on the second page

3    things like, "Ruth was a major contributor in the

4    writer of the EMTS user documents.  Ruth is very

5    productive, and the quality of her work is always

6    excellent."  This is a good review, isn't it?

7    A.    Yes, but, I mean, then again, the first

8    one, I mean, I started off with is a very good.  It

9    was a good review.  A good review is factual, and it

10   was the first time he was reviewing me, so he was

11   still getting to know my work and everything.  But

12   that was good.  That was fine.

13                    (Document marked as Anthony

14                    Exhibit 16 for identification)

15   Q.    Exhibit 16 is a photocopy of a performance

16   review for the period April 1, 1999 to March 31,

17   2000.  I take it you have seen this before?

18   A.    (Examines document)  Yes, I guess so.

19   Q.    That's your signature on the last page?

20   A.    Yes.

21   Q.    This review was done by John Butler?

22   A.    I think Marv Todd and Mr. Butler did the

23   reviews, I guess.  He signed it, so I guess he did,

24   yes.  Butler usually reviewed them with me, went

· 142

1   over them with me.

2        Q.   On this you got a "Good overall rating

3   performance, consistently meets expectations and job

4   requirements, may exceed expectations from time to

5   time"?

6        A.   Yes.

7                  (Document marked as Anthony

8                  Exhibit 17 for identification)

9        Q.   Against 17 is a photocopy of another

10  review, this one for the period of April 1, 2000

11  through March 31, 2001.

12       A.   (Examines document)  Yes.

13       Q.   The performance summary for this review

14  period is very good?

15       A.   Yes.

16       Q.   This review is actually higher in rating

17  than the two preceding reviews, isn't it?

18       A.   Yes.

19       Q.   This is the review that you did a response

20  to?

21       A.   Yes.  That was my last one there.

22       Q.   Actually, this is the first very good you

23  got.  In all three other reviews, your overall

24  rating was good?

152

1          Then they just walked away.  I thought we

2     would talk about it later.

3          I think when I spoke with Jacqueline

4     Newstadt, I think Mr. Butler was on vacation.  When

5     he came back, it was like February 7th, when they

6     terminated me.

7          Q.    Why is Mr. Busby being sued?

8          A.    He's the director of the program.  He's

9     over the contract.  He's allowing that to happen.

10         Q.    So there's nothing other than his role at

11    the company and the fact that you were terminated?

12         A.    Right.  There's nothing personal with any

13    of the defendants.

14         Q.    Did you know what "insubordination" meant?

15         A.    Yes.

16         Q.    If your supervisor says, "You need to move"

17    and an employee doesn't move, isn't that

18    insubordination?

19         A.    Yes, but they didn't say that.  It really

20    was a miscommunication, because we obviously were

21    not on the same wavelength.

22         Like I said, the only reason why I

23    challenged it, so to speak, is because Mr. Butler

24    said if it's a consensus.  To me, that means if

155

1    enough money." Obviously if somebody says, "If you

2    don't like it, leave," I mean I, know I can do that.

3    If I didn't like it, I would leave.

4        Q.    What is the basis of your claim against

5    Mr. Butler?  Is it all the same thing?

6        A.    They are all the same.

7        Q.    It's nothing personal.  It's just that you

8    believe you were treated unfairly and terminated

9    improperly?

10       A.    Yes, but beyond even from before the

11   termination, but yes, that's the whole thing.  You

12   know, they were in the position.  They were in that

13   position.  They abused their power.

14       Q.    How did they abuse their power?

15       A.    Because they wrongfully terminated me.

16       Q.    That's the abuse of power?  They wrongfully

17   terminated you?

18       A.    Yes.  They had power over the contract.

19   They no longer wanted me working on the contract.

20   Instead of just terminating me, they are going to

21   turn it around and say that, you know, try to make

22   me say that I resigned.

23       Q.    How about Mr. Todd, what did he do

24   personally?

156

1      A.    It's the same thing.  They are all the

2  same.

3      Q.    Didn't you get along with Mr. Todd?

4      A.    I told you I got along with them all, I

5  thought.  I liked them all very much.  It was just

6  like it seemed like when I started challenging stuff

7  like with Mary Costello, it was like everybody was

8  like defending her and against me, which again, it

9  looked like, you know, all the white folks lining up

10  against a black person.

11         MS. ACKERSTEIN:  It's ten of three.  Let's

12  take a short break and come back in a few minutes.

13  I'm just going to look over my notes.

14            (Recess at 2:50 p.m.)

15      BY MS. ACKERSTEIN:  (2:58 p.m.)

16      Q.    I asked you about the individual defendants

17  and what your claim against them was.  I didn't ask

18  you about Jacqueline Newstadt.

19            It's the same thing?  It's just the

20  termination; is that it?  It's not anything personal

21  that Jacqueline Newstadt ever did to you?

22      A.    No.  I didn't know her.  I knew her the

23  least of them all.

24      Q.    Do you have a home telephone number?

161

A.    Doreen Simon.

Q.    And your brother?

A.    Timothy Anthony.

Q.    Is there anything else about your
employment that we have not talked about today that
you think is relevant to your claim that you want to
tell me about?

A.    About my employment with CSC?

Q.    Is there anything about your employment
with CSC that we have not talked about yet today
that you believe is relevant to your claim?

A.    Yes, the fact that I had applied for a job,
and they have had several positions, and so they
obviously are not interested in rehiring me.

That's also part of the retaliation.  You
know, if they wouldn't rehire me, so I'm concerned
about what would they say, you know, if someone, a
reference called, if I have to give even for an
employment verification, you know, especially in
light of abandoning the job and everything, so that
they think that I did that, and so, you know,
obviously they are not interested.

If my performance was so good and, you
know, I got along with everybody, I don't understand

162

1    why there would be a problem with me returning there

2    to work there, which is all I was asking for in the

3    beginning, was my job back.

4        Q.    Let me ask you about that.  When did you

5    ask for your job back?

6        A.    When I brought -- well, first I reapplied

7    for the job.

8        Q.    You applied for a position in 2003?

9        A.    Yes, for a position.

10       Q.    You applied on the Internet?

11       A.    Yes.

12       Q.    You didn't exactly apply to a particular

13   person; you sent a resume on the Internet?

14       A.    Right.

15       Q.    You didn't pick up the phone and call

16   anybody?

17       A.    No.

18       Q.    You didn't call Patti Skiles or Jackie

19   Newstadt or Marvin Todd?

20       A.    No.

21       Q.    You didn't call John Butler or Ralph Busby?

22       A.    No.

23       Q.    You sent something on the Internet, right?

24       A.    Right.

163

 1      Q.    Did you apply for any position other than

 2   that one in 2003?

 3      A.    With CSC?

 4      Q.    Yes.

 5      A.    No.

 6      Q.    So there was one position you applied for

 7   in 2003?

 8      A.    Right.

 9      Q.    You don't know if that position was ever

10   filled, do you?

11      A.    No, but they've had some others since then.

12      Q.    But you only applied for one?

13      A.    Yes.

14      Q.    With respect to references, you have never

15   asked any employer to call anybody at CSC?

16      A.    No, but sometimes I have to put down as far

17   as verifications.  Even those temp agencies, they

18   want to know, and some of the applications have, you

19   know, Who did you report to?  Where did you work?

20   What was the reason for leaving?  Who did you report

21   to?

22      Q.    But you don't know that any prospective

23   employer has ever called CSC about anything?

24      A.    No, I don't.

167

```
1   COMMONWEALTH OF MASSACHUSETTS)

2   SUFFOLK, SS.                    )

3        I, Ken A. DiFraia, Registered Professional

4   Reporter and Notary Public in and for the

5   Commonwealth of Massachusetts, do hereby certify

6   that there came before me on the 23rd day of Nov.,

7   2004, at 10:00 a.m., the person hereinbefore named,

8   who was by me duly sworn to testify to the truth and

9   nothing but the truth of her knowledge touching and

10  concerning the matters in controversy in this cause;

11  that she was thereupon examined upon her oath, and

12  her examination reduced to typewriting under my

13  direction; and that the deposition is a true record

14  of the testimony given by the witness.

15       I further certify that I am neither attorney or

16  counsel for, nor related to or employed by, any

17  attorney or counsel employed by the parties hereto

18  or financially interested in the action.

19       In witness whereof, I have hereunto set my hand

20  and affixed my notarial seal this 9th day of

21  December, 2004.

22                        

23                          Notary Public

24                  My commission expires 4/3/09
```



DORIS O. WONG ASSOCIATES, INC.
(617) 426-2432 ~ Fax (617) 482-7813